**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

IRON MOUNTAIN INC.,

and

RECALL HOLDINGS LTD.

*Defendants*.

**COMPETITIVE IMPACT STATEMENT**

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry

in this civil antitrust proceeding.

**I.     NATURE AND PURPOSE OF THE PROCEEDING**

On June 8, 2015, Iron Mountain Inc. ("Iron Mountain") reached an agreement to acquire

all of the outstanding shares of Defendant Recall Holdings Ltd. ("Recall") in a transaction valued

at approximately $2.6 billion.  The United States filed a civil antitrust Complaint on March 31,

2016, seeking to enjoin the proposed acquisition.  The Complaint alleges that the likely effect of

the acquisition would be to lessen competition substantially for the provision of hard-copy

records management services ("RMS") in violation of Section 7 of the Clayton Act, 15 U.S.C. §

18, in the following fifteen metropolitan areas:  Detroit, Michigan; Kansas City, Missouri; Charlotte, North Carolina; Durham, North Carolina; Raleigh, North Carolina; Buffalo, New York; Tulsa, Oklahoma; Pittsburgh, Pennsylvania; Greenville/Spartanburg, South Carolina; Nashville, Tennessee; San Antonio, Texas; Richmond, Virginia; San Diego, California;  Atlanta, Georgia; and Seattle, Washington. This loss of competition likely would result in consumers paying higher prices for RMS and receiving inferior service in these areas.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order ("Hold Separate") and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition.  Under the proposed Final Judgment, which is explained more fully below, Defendants are required to divest specified RMS assets in each of the 15 metropolitan areas of concern.  Under the terms of the Hold Separate, Defendants will take certain steps to ensure that the assets are operated as competitively independent, economically viable, and ongoing business concerns that will remain independent and uninfluenced by the consummation of the acquisition, and that competition is maintained during the pendency of the ordered divestitures.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA.  Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.   DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

A.   *The Defendants and the Proposed Transaction*

Iron Mountain is a Delaware corporation headquartered in Boston, Massachusetts.  Iron Mountain is the largest RMS company in the United States, providing document storage and related services throughout the nation.  For fiscal year 2014, Iron Mountain reported worldwide revenues of approximately $3.1 billion.

Recall is an Australian company headquartered in Norcross, Georgia.  Recall is the second-largest RMS company in the United States and provides document storage and related services throughout the nation.  Recall's worldwide revenues for 2014 were approximately $836.1 million.

On June 8, 2015, Iron Mountain and Recall entered into an agreement pursuant to which Iron Mountain proposes to acquire Recall for approximately $2.6 billion in cash and stock, subject to adjustments.

The proposed transaction, as initially agreed to by Defendants, would lessen competition substantially in the provision of RMS in the relevant markets.  This acquisition is the subject of the Complaint and proposed Final Judgment filed by the United States on March 31, 2016.

B.   *The Competitive Effects of the Transaction*

1.   The Relevant Service Market

The Complaint alleges that RMS constitute a relevant product market and line of commerce within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.  For a variety of legal and business reasons, companies frequently must keep hard-copy records for significant periods of time.  Given the physical space required to store any substantial volume of records

3

and the effort required to manage stored records, many customers contract with RMS vendors such as Iron Mountain and Recall to provide these services.

RMS vendors typically pick up records from customers and bring them to a secure off-site facility, where they then index the records to allow their customers to keep track of them. RMS vendors retrieve stored records for their customers upon request and often perform other services related to the storage, tracking, and shipping of records.  For example, they sometimes destroy stored records on behalf of the customer once preservation is no longer required.

Customers of RMS include Fortune 500 firms, as well as local businesses throughout the United States.  Customers often procure RMS by competitive bid and contracts usually specify fees for each service provided (*e.g.,* pickup, monthly storage, retrieval, delivery, and transportation).  Most customers purchase RMS in only one city.  Some customers with operations in multiple cities prefer to purchase RMS from a single vendor pursuant to a single contract; other multi-city customers disaggregate their contracts and purchase RMS from different vendors in different cities.

The Complaint alleges for companies with a significant volument of records, in-house storage is generally not a viable substitute for RMS.  For a company to manage its records in-house, it must have a substantial amount of unused space, racking equipment, security features, and one or more dedicated employees.  Similarly, entirely replacing RMS with digital records management services is generally not feasible.  To switch from physical to electronic records, a customer would need to fundamentally shift its method of creating, using and storing records and adopt an entirely paperless system.

4

For these reasons, the Complaint alleges that a hypothetical monopolist of RMS could profitably increase its prices by at least a small but significant non-transitory amount.  In the event of a small but significant increase in price for RMS, customers would not switch to any other alternative.  Thus, the Complaint alleges that the provision of RMS constitutes a relevant service market for purposes of analyzing the effects of the transaction.

2. <u>Relevant Geographic Markets</u>

The geographic market for RMS consists of a metropolitan area or a radius around a metropolitan area.  Customers generally require a potential RMS vendor to have a storage facility located within a certain proximity to the customer's location.  Customers generally will not consider vendors located outside a particular radius, because the vendor will not be able to retrieve and deliver records on a timely basis.  The radius a customer is willing to consider is usually measured in time, rather than miles, as the retrieval of records may be a time-sensitive matter.  Transportation costs also likely render a distant RMS vendor uncompetitive with vendors located closer to the customer.

In each of the metropolitan areas identified in the Complaint, a hypothetical monopolist RMS firm could profitably increase prices to local customers without losing significant sales to more distant competitors.  Accordingly, each of these metropolitan areas is a relevant geographic market for the purposes of analyzing the competitive effects of the acquisition under Section 7 of the Clayton Act, 15 U.S.C. § 18.

3. <u>Anticompetitive Effects of the Proposed Acquisition</u>

As alleged in the Complaint, Iron Mountain and Recall are the two largest RMS providers in the United States and the only significant RMS providers, or two of only a few

significant RMS providers, in each of the relevant geographic markets.  In each of the

geographic markets, Iron Mountain is the largest RMS provider, Recall is the second- or third-

largest RMS competitor, and the market is highly concentrated.  In each of these markets, Iron

Mountain and Recall directly compete with one another to provide RMS, resulting in lower

prices and better quality service for RMS customers.  According to the Complaint, the significant

increase in concentration and loss of head-to-head competition that will result from the proposed

acquisition will likely cause prices for RMS to increase and the quality of RMS services to

decline in each relevant market.

>    4.    Difficulty of Entry

According to the Complaint, it is unlikely that entry or expansion into the provision of

RMS in the relevant geographic markets would be timely, likely, or sufficient to defeat the likely

anticompetitive effects of the proposed acquisition.

Any new RMS entrant would be required to expend significant time and capital to

successfully enter any of the relevant markets.  Entry into a new geographic market requires a

secure facility, racking equipment, delivery trucks, tracking software, and employees.  In

addition, a new entrant would have to expend substantial effort to build a reputation for

dependable service, which is important to RMS customers who demand quick and reliable

pickup of and access to their stored records.  In order to recoup the costs of entry, an RMS

vendor must fill a substantial amount of its facility's capacity.  However, acquiring customers

from existing RMS vendors in order to fill this capacity is often complicated by provisions in the

customers' contracts requiring payment of permanent withdrawal fees if the customer

permanently removes a box or record from storage.  Customers will sometimes pay these

withdrawal fees themselves, but more commonly, the new vendor will have to offer to pay the fees to induce the customer to switch.  The vendor must then recoup the cost of the fees by amortizing the cost over a longer contract, or charging higher prices while still charging a competitive price for its services.  Contracts often impose a cap on the number of boxes per month that a customer may permanently remove from a RMS vendor's facility, such that a switch to a new RMS vendor may take several months or more to complete.  Taken together, permanent withdrawal fees and other withdrawal restrictions make it difficult for a new RMS entrant to win customers away from existing RMS vendors.

Such fees and withdrawal restrictions also make it more difficult for existing RMS vendors to expand significantly.  For all of these reasons, the Complaint alleges that new entry or expansion by existing firms is unlikely to remedy the anticompetitive effects of the proposed acquisition.

## III.    **EXPLANATION OF THE PROPOSED FINAL JUDGMENT**

A.    *Divestitures*

The divestitures required by the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition by establishing independent and economically viable competitors in the provision of RMS in each of the relevant geographic markets.

The proposed Final Judgment requires Defendants to divest, as viable ongoing business concerns, Recall RMS assets in all fifteen geographic markets identified in the Complaint (collectively, the "Divestiture Assets").  The Divestiture Assets include specified Recall records management facilities in these areas along with all tangible and intangible assets used in the operation of the records management businesses associated with these facilities.  In each of the

geographic markets other than Atlanta, Defendants are divesting all of Recall's RMS assets.  In

Atlanta, Defendants are divesting most, but not all, of Recall's RMS facilities because the

facilities to be divested are sufficient to serve all of Recall's local customers in Atlanta and to

compete for new business in the area.

Section IV.A of the proposed Final Judgment requires Defendants, within 10 calendar

days after consummation of the transaction sought to be enjoined by the Complaint, to divest

RMS assets in thirteen of the fifteen geographic markets to Access CIG, LLC ("Access").

Access is an established player in the RMS industry and is currently the third-largest RMS

provider in the United States.  In addition to preserving competition in each of the thirteen

geographic markets, the divestitures, when combined with Access's existing operations, will

enable Access to offer RMS in all of the metropolitan areas that Recall currently offers RMS.

Access will be acquiring the Divestiture Assets in Detroit, Kansas City, Charlotte, Durham,

Raleigh, Buffalo, Tulsa, Pittsburgh, Greenville/Spartanburg, Nashville, San Antonio, Richmond,

and San Diego.  If, for some reason, Defendants are unable to complete the divestitures to

Access, they must sell the Divestiture Assets to an alternative purchaser approved by the United

States.

Section IV.B of the proposed Final Judgment requires Defendants, within ninety days

after consummation of the transaction sought to be enjoined by the Complaint, or five days after

notice of the entry of the Final Judgment by the Court, whichever is later, to divest specified

RMS assets as viable ongoing businesses in the remaining two geographic markets.  In these two

geographic areas—Atlanta and Seattle—Access is already a significant RMS provider, and thus

a divestiture to Access would not restore the competition lost through the proposed acquisition.

8

Pursuant to Section IV.L, Defendants must divest the Divestiture Assets in such a way as to satisfy the United States in its sole discretion that the assets can and will be operated by the purchasers as viable, ongoing records management businesses that can compete effectively in the relevant markets.  Defendants must take all reasonable steps necessary to accomplish the divestitures required by Sections IV.A and IV.B quickly and shall cooperate with prospective purchasers.

In the event that the Defendants do not accomplish all of the divestitures within the periods prescribed in the proposed Final Judgment, Section V provides that the Court will appoint a trustee selected by the United States to effect the divestiture of any remaining Divestiture Assets.  If a trustee is appointed, Section V provides that Defendants will pay all costs and expenses of the trustee.  The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestitures are accomplished.  After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture.  At the end of six months, if the divestitures have not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

C.    *Other Divestiture-Related Provisions*

Section IV.I of the proposed Final Judgment gives the purchasers of the Divested Assets the right to require the Defendants to provide certain transition services pursuant to a transition services agreement.  This provision is designed to ensure the smooth operation of the divested

assets during the first six months after the sale of the Divestiture Assets.

Section IV.J of the proposed Final Judgment is designed to help ensure that the purchasers of the Divestiture Assets can compete to provide RMS to customers that are served by both divested records management facilities and records management facilities that are being retained by Defendants.  These customers are defined as Split Multi-City Customers in Section II.L.  Section IV.J of the proposed Final Judgment requires Defendants to allow any Split Multi-City Customer to terminate or otherwise modify its contract with Defendants so as to enable the customer to transfer records to the purchaser(s) of the Divestiture Assets without paying permanent withdrawal fees, retrieval fees, or other fees associated with transferring such customer's records from a Recall records management facility that would otherwise be required under the customer's contract with Defendants.  If a Split Multi-City Customer chooses to exercise this provision, it will only be required to pay Defendants the costs associated with transporting the records from Defendants' RMS facilities to the new facility, and the costs associated with reshelving the records at the new facility, if such customer requests such services from the Defendants.  All Split Multi-City Customers will be informed of their rights under Section IV.J by letter as specified in Section IV.K of the proposed Final Judgment.

D.     *Notification of Future Acquisitions*

Section XI of the proposed Final Judgment requires Defendants to provide advance notification of certain future proposed acquisitions not otherwise subject to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a.  Specifically, Defendants must provide at least thirty days advance written notice to the United States before Defendants acquire, directly or indirectly, any interest in any RMS business located within fifty miles of any

Iron Mountain RMS facility located in the geographic areas listed in Appendix C of the proposed

Final Judgment where the business to be acquired generated at least $1 million in revenues from

RMS in the most recent completed calendar year.  Section XI then provides for waiting periods

and opportunities for the United States to obtain additional information similar to the provisions

of the HSR Act before acquisitions in these geographic areas can be consummated.

The geographic areas listed in Appendix C include the fifteen geographic markets subject

to divestitures as well as certain other metropolitan areas where Iron Mountain and Recall both

provided RMS prior to the proposed acquisition.  Although the United States did not believe that

divestitures in these geographic areas were necessary, given the consolidation trends in the RMS

industry, the United States sought to ensure that the Division had the opportunity to review

future acquisitions in these areas so that it can seek effective relief, if necessary.  The additional

metropolitan areas covered by Section XI are: Phoenix, Arizona; Denver, Colorado;

Jacksonville, Florida; Miami, Florida; Orlando, Florida; Minneapolis, Minnesota; St. Louis,

Missouri; Las Vegas, Nevada; Cleveland, Ohio; Portland, Oregon; Dallas, Texas; and Houston,

Texas.

## IV.     REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been

injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to

recover three times the damages the person has suffered, as well as costs and reasonable

attorneys' fees.  Entry of the proposed Final Judgment will neither impair nor assist the bringing

of any private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act,

15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent

private lawsuit that may be brought against Defendants.

## V.     PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent.  The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment.  Any person who wishes to comment should do so within sixty days of the date of publication of this Competitive Impact Statement in the *Federal Register*, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later.  All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court.  In addition, comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website and, under certain circumstances, published in the *Federal Register*.

Written comments should be submitted to:

> Maribeth Petrizzi, Chief
> Litigation II Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth Street, NW, Suite 8700
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.   ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants.  The United States could have continued the litigation and sought preliminary and permanent injunctions against the proposed acquisition.  The United States is satisfied, however, that the divestiture of assets described in the proposed Final Judgment will preserve competition for the provision of RMS in the relevant markets identified by the United States.  Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII.   STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest."  15 U.S.C. § 16(e)(1).  In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

(A)     the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

13

(B)     the impact of entry of such judgment upon competition in the relevant market or
        markets, upon the public generally and individuals alleging specific injury from
        the violations set forth in the complaint including consideration of the public
        benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the Court's inquiry is

necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d

1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489

F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United*

*States v. U.S. Airways Group, Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the

"court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-

1965 (JR), 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, at *3, (D.D.C.

Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires

"into whether the government's determination that the proposed remedies will cure the antitrust

violations alleged in the complaint was reasonable, and whether the mechanism to enforce the

final judgment are clear and manageable.").[1]

    As the United States Court of Appeals for the District of Columbia Circuit has held,

under the APPA a court considers, among other things, the relationship between the remedy

secured and the specific allegations set forth in the government's complaint, whether the decree

is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree

may positively harm third parties.  *See Microsoft*, 56 F.3d at 1458-62.  With respect to the

---

[1]  The 2004 amendments substituted "shall" for "may" in directing relevant factors for courts to
consider and amended the list of factors to focus on competitive considerations and to address potentially
ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see
also SBC Commc'ns,* 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal
changes" to Tunney Act review).

adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that a court should not reject the proposed remedies because it believes others are preferable); *Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

---

[2]  *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter.  "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'"  *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (noting that room must be made for the government to grant concessions in the negotiation process for settlements) (citing *Microsoft*, 56 F.3d at 1461); *United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy).  To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms."  *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case."  *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable);  *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged").  Because the "court's authority to review the decree depends

entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60. As this Court confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). Rather, the procedure for the public interest determination is left to the discretion of the Court, with the recognition that the Court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[3]

---

[3] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, No. 73-CV-681-W-1, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980, *22 (W.D. Mo. 1977)

A court can make its public interest determination based on the competitive impact statement and response to public comments alone. *U.S. Airways*, 38 F. Supp. 3d at 76.

## VIII.   **DETERMINATIVE DOCUMENTS**

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: March 31, 2016

Respectfully submitted,

Soyoung Choe
U.S. Department of Justice, Antitrust Division
Networks & Technology Enforcement Section
450 Fifth Street, N.W., Suite 7100
Washington, D.C. 20530
Phone: (202) 598-2436
Facsimile: (202) 616-8544
E-mail: soyoung.choe@usdoj.gov

---

("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").