**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                       )
United States of America,              )
                                       )
        Plaintiff,                     )
                                       )
             v.                        )        Civil No. 16-cv-00595 (APM)
                                       )
Iron Mountain, Inc., *et al.*,         )
                                       )
        Defendants.                    )
_____ )

**MEMORANDUM OPINION**

## I.    INTRODUCTION

The United States filed this action against Iron Mountain, Inc. ("Iron Mountain"), and Recall Holdings Ltd. ("Recall") (collectively "Defendants"), alleging that Iron Mountain's proposed acquisition of Recall would violate Section 7 of the Clayton Act, 15 U.S.C. § 18. *See* Compl., ECF No. 1, ¶¶ 3, 25. The United States filed with its Complaint a Hold Separate Stipulation and Order, ECF No. 4-1, which the court executed, ECF No. 9; a proposed Final Judgment, ECF No. 4-2; and a Competitive Impact Statement, ECF No. 3 [hereinafter CIS]. Thereafter, as required by the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) (the "Tunney Act"), the United States published and subjected the proposed Final Judgment to a 60-day public comment period, which expired on May 25, 2015, *see* Mot. and Mem. of the United States, ECF No. 15 [hereinafter U.S. Mot.], at 3. The public comment period elicited a single response—from National Records Center, Inc.—to which the United States responded and published the comment and response in the *Federal Register*. *See* Resp. of the United States to Public Comment, ECF No. 13 [hereinafter U.S. Resp.]. The United States now asks the court to

enter the agreed-upon Final Judgment, which would permit Iron Mountain and Recall to complete the proposed transaction subject to conditions intended to remedy the violations identified in the Complaint. *See* U.S. Mot.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     *Relevant Product and Geographic Markets*

Iron Mountain is the largest hard-copy records management services ("RMS") provider in the United States, with reported worldwide revenues of approximately $3.1 billion in 2014. CIS at 3.  Recall is the country's second-largest RMS provider, with worldwide revenues of $836.1 million in 2014. *Id.*  The relevant product market—RMS—involves the off-site storage of records and the provision of related services, such as indexing, transporting, and destroying records. *Id.* at 3–4.  "[T]he Complaint alleges that a hypothetical monopolist of RMS could profitably increase its prices by at least a small but significantly non-transitory amount . . . [and] customers would not switch to any other alternative." *Id.* at 5.

RMS customers include companies throughout the United States, ranging from Fortune 500 companies to small local businesses.  *Id.* at 4. The relevant geographic market, however, is a metropolitan area or a radius around such area. *Id.* at 5.  That is because customers typically require a RMS vendor to have a storage facility located within a certain proximity of the customer's location.  *Id.*  Vendors outside a particular radius are not competitive with closer-in vendors because longer-distance "vendor[s] will not be able to retrieve and deliver records on a timely basis" and because such vendors are likely to incur higher transportation costs, rendering them a more costly alternative. *Id.*  The Complaint identifies 15 metropolitan areas—the relevant

geographic markets—in which RMS vendors "could profitably increase prices to local customers without losing significant sales to more distant competitors." *Id.*; Compl. ¶ 17.

          2.     *Proposed Merger between Iron Mountain and Recall*

On June 8, 2015, Iron Mountain reach an agreement to acquire all the outstanding shares of Recall, a transaction valued at $2.6 billion.   CIS at 1.   After the proposed merger's announcement, the United States, through the Department of Justice, conducted an investigation into the potential anti-competitive effects of the proposed transaction on RMS consumers in various geographic areas.   U.S. Resp. at 2.   "As part of [this] investigation, the United States obtained documents and information from the merging parties and others and conducted more than 160 interviews with customers, competitors, and other persons with knowledge of the [RMS] industry."   *Id.* at 2–3.

Following its investigation, the United States concluded that the proposed merger likely would lessen competition in 15 metropolitan areas.   *Id.* at 4; Compl. ¶ 17.   "In each of these geographic areas, Iron Mountain and Recall are two of only a few significant firms providing RMS."   U.S. Resp. at 4.   Furthermore, in each of those areas, the United States found, the merger would result in a "substantial increase in concentration and loss of head-to-head competition between Iron Mountain and Recall" and "likely would result in higher prices and lower quality services for RMS customers."   *Id.*

To address these competitive concerns, the United States required, as a condition of approving the merger, a divestiture of Recall's assets.   In 13 metropolitan areas, Recall will be required to sell its assets to a third-party, Access CIG, LLC ("Access"), and in two metropolitan areas, Recall will be required to sell its assets to a to-be-determined buyer acceptable to the United States.   *Id.*   The required divestiture will include the sale of 26 Recall storage facilities, along with

associated assets, such as customer contracts. *Id.* According to the United States, the "[d]ivestiture of the assets to independent, economically viable competitors will ensure that customers of [RMS] will continue to receive the benefits of competition." *Id.*

### B.    Procedural Background

The United States filed this action against Iron Mountain and Recall, alleging that the proposed merger would violate Section 7 of the Clayton Act, 15 U.S.C. § 18. *See* Compl. ¶¶ 3, 25. The United States filed with its Complaint a Hold Separate Stipulation and Order, which the court entered on April 7, 2016, ECF No. 9. The purpose of that Stipulation and Order was to "ensure[], prior to [the] divestitures, that the Divestiture Assets remain independent [and] economically viable[,] . . . [that] ongoing business concerns . . . remain independent and uninfluenced by Iron Mountain, and that competition is maintained during the pendency of the ordered divestitures." *Id.* at 5. With its Complaint, the United States also filed a proposed Final Judgment and a Competitive Impact Statement. *See* Final Judgment, ECF No. 4-2; CIS.

Thereafter, as required by the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) (the "Tunney Act"), the United States published and subjected the proposed Final Judgment to a 60-day public comment period, which expired on May 25, 2015, *see* U.S. Mot. at 3. The public comment period elicited a single comment from a competitor in the RMS industry, National Records Centers, Inc. ("NRC"). U.S. Resp. at 8. The United States published NRC's comment and the United States' response in the *Federal Register. See id.* at 13. Now before the court is the United States' Motion for Entry of Final Judgment. *See generally* U.S. Mot.

## III.    LEGAL STANDARD

The Tunney Act requires courts, "[b]efore entering any consent judgment proposed by the United States," to "determine that the entry of such judgment is in the public interest." 15 U.S.C.

4

§ 16(e).  The parameters of the Tunney Act's "public interest" standard are well defined by statute, *see* 15 U.S.C. § 16(e)(1), and case law, *see, e.g.*, *United States v. Newpage Holdings, Inc.*, No. 14-cv-2216, 2015 WL 9982691, at \*4–5 (D.D.C. Dec. 11, 2015).  The court, therefore, need not provide a fulsome recitation of the applicable standards.  It suffices for present purposes to note that the government enjoys "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995).  And, although a court may not simply "rubber stamp" the government's proposal and is required to "make an independent determination" as to the public interest, *id.* at 1458 (internal quotation marks omitted), it "is not permitted to reject the proposed remedies merely because the court believes other remedies are preferable," *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 15 (D.D.C. 2007).  Indeed, the court is required to be "deferential to the government's predictions as to the effect of the proposed remedies." *Microsoft Corp.*, 56 F.3d at 1461.  In short, "the relevant inquiry is whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable." *SBC Commc'ns, Inc.*, 489 F. Supp. 2d at 15–16.

## IV.     DISCUSSION

### A.     The Public Interest Inquiry

The court has carefully reviewed the United States' Complaint, as well as its proposed Final Judgment, Competitive Impact Statement, and Response to NRC's comment, and finds that the proposed Final Judgment "is in the public interest."  15 U.S.C. § 16(e)(1).  In reaching that conclusion, the court has considered, in particular, the clarity of the proposed Final Judgment, the sufficiency of its enforcement mechanisms, and the competitive impact on third parties. *See Microsoft*, 56 F.3d at 1458–62.  The court briefly discusses each of those factors.

5

A "district judge who must preside over the implementation of the decree is certainly entitled to insist on that degree of precision concerning the resolution of known issues as to make his task, in resolving subsequent disputes, reasonably manageable." *Id.* at 1461–62. On that score, the Final Judgment is satisfactory. The Final Judgment turns largely on the proposed divestiture of Recall's assets and provides a detailed framework by which such divestiture is to occur. Proposed Final Judgment, ECF No. 15-1, at 7–11. The Final Judgment, among other things, outlines the geographic markets and assets located in those markets subject to the divestiture, *id.* at 7 & apps. A, B; the timing of the divestiture, *id.* at 7; the mechanism for publicizing the sale of assets if not divested to Access, *id.* at 7–8; the method for transitioning Recall employees to the acquiring company, *id.* at 8; and the availability of a transition services agreement by an acquiring company, *id.* at 9. The Final Judgment also addresses the situation of Recall customers—defined as "Split Multi-City Customers"—who presently contract for RMS both from Recall's records management facilities subject to the divestiture *and* from its facilities that are to be retained by the post-merger entity. *Id.* at 6, 9–10. To enable such customers to consolidate their RMS needs with an acquiring company, the Final Judgment permits them to terminate or modify existing contracts with Recall without paying a permanent withdrawal fee, retrieval fees, or other fees associated with transferring records. *Id.* at 9–10. In short, the court is satisfied that the Final Judgment reflects the "degree of precision" necessary for the court to resolve any subsequent disputes that might arise concerning the Final Judgment's implementation.

Next, the Final Judgment contains sufficient enforcement mechanisms to ensure that its remedies are implemented, even if Iron Mountain and Recall fail to meet their divestiture obligations. Specifically, in the event that Defendants do not accomplish the required divestitures within the periods prescribed, the court must appoint a Trustee selected by the United States and

approved by the court to carry out the divestiture of any remaining assets. *Id.* at 11–12. The Trustee shall have the power to sell any remaining assets to a buyer acceptable to the United States, and the Defendants may not object to such sale except for Trustee malfeasance. *Id.* The Trustee will be required to file monthly reports with the court, and Defendants will be responsible for all costs and expenses of the Trustee. *Id.* Based on the foregoing, the court is satisfied that the Final Judgment contains a sufficient enforcement mechanism to ensure a complete sale of Recall's assets subject to divestiture. *Cf. Newpage Holdings*, 2015 WL 9982691, at *6 (finding similar enforcement provisions "adequate").

Finally, the court finds that the planned divestiture will likely mitigate any anti-competitive effects of the merger. As discussed, the United States conducted an extensive investigation of the merger's potential anti-competitive effects, *see* U.S. Resp. at 2–3, and it concluded that such effects would be eliminated by Recall's divestiture of assets in 15 geographic markets, *see* CIS at 7 ("The divestitures required by the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition by establishing independent and economically viable competitors in the provision of RMS in each of the relevant geographic markets."). Because "[t]he United States' predictions are entitled to deference," particularly as they relate to the effect of proposed remedies, *Newpage Holdings*, 2015 WL 9982691, at *5; *Microsoft Corp.*, 56 F.3d at 1461, the court finds that the planned divestiture will likely neutralize the merger's anti-competitive impacts.

Accordingly, the court finds that, under the limited standard of review required by the Tunney Act, the proposed Final Judgment is in the public interest.

### B.     National Records Centers, Inc.'s Comment

During the Tunney Act's 60-day public comment period, National Records Centers, Inc. ("NRC")—a competitor in multiple markets—submitted a three-page letter objecting to the

proposed approval of the merger.  U.S. Resp., Ex. 1, ECF No. 13-1 [hereinafter NRC Letter].  NRC complained that "[c]ombining the number one company in the industry with the number two company is unfair and anticompetitive by its very nature" and urged the Department of Justice to "re-think" the merger "in its totality."  *Id.* at 1.  Alternatively, NRC suggested that *all* customers affected by the merger should be permitted to switch their RMS provider without penalty, not just those specified in the Final Judgment.  *Id.* at 1–2.  Finally, NRC recommended two less drastic changes to the Final Judgment: (1) that Split Multi-City Customers be permitted to terminate their contracts with Defendants without penalty so as to allow transfer to *any* RMS provider, not just an acquiring company, and that the period to make such a move be extended from one to three years; and (2) that the Final Judgment's definition of "Spilt Multi-City Customer" be broadened by deleting the following from Section II.L: "A Split Multi-City Customer does not include a Recall customer that has separate contracts for each Recall facility in which it stores records."  *Id.* at 2–3.

"In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that '[t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms.'"  *Newpage Holdings*, 2015 WL 9982691, at *7 (quoting *United States v. Abitibi-Consol, Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008)).  Accordingly, the court's role is limited to "evaluating whether the Proposed Final Judgment provides a reasonably adequate remedy for the harms alleged in the Complaint, and the court will defer to the United States' predictions regarding the effect of its proposed remedies."  *Id.*

Here, the United States has provided a sufficient factual basis that its proposed remedy— the divestiture of certain of Recall's assets—is adequate to remedy the alleged harms.  Again,

following a substantial investigation, the United States identified anti-competitive effects in 15 local markets as the potential harm arising from the merger. U.S. Resp. at 4. "The proposed Final Judgment is designed to address the competitive concerns in each of these 15 metropolitan markets." *Id.* The United States' proposed solution to remedy that harm is to require Recall to divest its assets, including customer contracts, in 13 of those markets to Access and in two of those markets to another acquirer approved by the United States. *Id.* As to NRC's demand that the Department of Justice "re-think" the merger "in its totality," NRC Letter at 1, the United States has adequately explained that requiring divestitures in those 15 local markets "is sufficient to protect competition," U.S. Resp. at 10. It also has offered facts that enable the court to conclude that Access is an appropriate divestiture partner. CIS at 8 ("Access is an established player in the RMS industry and is currently the third-largest RMS provider in the United States."). The court must defer to that assessment. *See Microsoft Corp.*, 56 F.3d at 1461.

The same holds true with respect to NRC's complaint that *all* customers affected by the merger should be able to switch providers without incurring any fees. NRC Letter at 1–2. As the United States has explained, the harm it sought to remedy was limited to 15 geographical markets. U.S. Resp. at 11–12. Therefore, NRC's proposal to allow *all* customers—regardless of their location—to switch customers without incurring a penalty "would far exceed what is necessary to remedy the harm found by the United States and alleged in the Complaint." *Id.* at 12 (citing *Microsoft Corp.*, 56 F.3d at 1459–60). Again, the court defers to the United States' determination as to the appropriate scope of the remedy. *See Microsoft Corp.*, 56 F.3d at 1461.

Lastly, as to NRC's final two criticisms—both of which concern the treatment of Split Multi-City Customers, NRC Letter at 2–3—the United States has explained that the "Final Judgment is designed to allow customers with a preference for a single vendor pursuant to a single

contract to transfer their records such that the records will not be stored at facilities managed by different vendors." U.S. Resp. at 12. The court must defer to the United States' determination that the definition of "Split Multi-City Customers" is sufficient to satisfy that objective. Likewise, as to NRC's suggestion that time period for a transfer be increased from one year to three years, the court accepts the United States' explanation that the shorter time period is preferable because "it is in the best interest of the industry and competition that any period of disruption or uncertainty in the relevant markets be minimized." *Id.*

In summary, none of NRC's comments alter the court's determination that the proposed Final Judgment satisfies the "public interest" standard.

## V.      CONCLUSION

For the foregoing reasons, the court is satisfied that the United States has complied with the requirements of the Tunney Act and that entry of the proposed Final Judgment is in the public interest. Accordingly, the court grants the United States' Motion for Entry of Final Judgment. The Final Judgment will issue separately.


Dated:  November 11, 2016                    Amit P. Mehta
                                             United States District Judge